313 F.3d 768
 Pam TAYLOR, Plaintiff-Appellant,
v.
VERMONT DEPARTMENT OF EDUCATION, David S. Wolk, Commissioner, Vermont Department of Education, Addison Central Supervisory Union, John Murphy, Addison Central Supervisory Union Support Service Coordinator, Amy Brown, Addison Central Supervisory Union Learning Specialist, Addison Northeast Supervisory Union, Louise Acker, Addison Northeast Supervisory Union Special Education Representative, Weybridge School District, Christina Johnson, Principal, Weybridge Elementary School, Starksboro School District, and Mary Heins, Principal, Robinson Elementary School, Defendants-Appellees.
 Docket No. 01-7566.
 United States Court of Appeals, Second Circuit.
 Argued: February 4, 2002.
 Decided: December 20, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED James M. Dingley, Roesler, Whittlesey, Meekins & Amidon, Burlington, VT, (Marsha S. Meekins, on the brief) for Plaintiff-Appellant.
 John Davis Buckley, Theriault & Joslin, P.C., Montpelier, VT, (Laura Q. Pelosi, on the brief) for Defendants-Appellees Addison Northeast Supervisory Union, Starksboro School District, Mary Heins and Louise Acker.
 Patti R. Page, Stitzel, Page & Fletcher, P.C., Burlington, VT, for Defendants-Appellees Addison Central Supervisory Union, Weybridge School District, John Murphy, Amy Brown, and Christina Johnson.
 Geoffrey A. Yudien, Special Assistant Attorney General, Vermont Department of Education, for William H. Sorrell, Attorney General for the State of Vermont, Montpelier, VT, for Defendants-Appellees Vermont Department of Education and Commissioner David S. Wolk.
 Before: POOLER, SOTOMAYOR, Circuit Judges, and KAPLAN, District Judge.*
 SOTOMAYOR, Circuit Judge.
 
 
 1
 We are presented with the question of who is entitled to exercise the rights afforded to a "parent" under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. Plaintiff-appellant Pam Taylor alleges that the defendants have violated statutory rights she possesses as the natural mother of a child who suffers from a disability. The United States District Court for the District of Vermont (Niedermeier, Mag. J.) granted defendants' motion to dismiss plaintiff's action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), holding that plaintiff, whose legal authority over the child had been curtailed by a state divorce decree, lacked standing to pursue an action under either statute.
 
 
 2
 On appeal, Taylor argues that a natural mother is entitled to exercise parental rights under the IDEA and FERPA, and that state law cannot abrogate these federal rights. We decline plaintiff's invitation to federalize the law of domestic relations and hold that the IDEA and FERPA leave intact a state's authority to determine who may make educational decisions on behalf of a child, so long as a state does so in a manner consistent with the federal statutes. We therefore affirm the district court's dismissal of the claims related to plaintiff's requests for an Individual Educational Evaluation and amendment of inaccurate information contained in her daughter's academic files. We also affirm the dismissal of plaintiff's 42 U.S.C. § 1983 claim based on FERPA, § 1232g(a), under the reasoning of Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Nevertheless, because plaintiff retains some important rights under the divorce decree — specifically the right to reasonable information regarding her daughter's health and progress in school — we vacate the district court's judgment insofar as it dismissed her IDEA claim that she was denied access to her child's educational records. We further hold that plaintiff was not required to exhaust her administrative remedies against the Addison Northeast Supervisory Union ("ANSU") defendants, because it would have been futile for Taylor to pursue her IDEA administrative remedies against the ANSU defendants and because it is improbable that she could have obtained relief from the administrative proceedings. Finally, we hold that the magistrate judge's decision not to recuse himself sua sponte was not fundamental error.
 
 BACKGROUND
 
 3
 Plaintiff Appellant Pam Taylor has alleged the following facts. Taylor is the natural mother of L.D., who at the time of the complaint was a student at the Weybridge Elementary School in Vermont. Taylor obtained a divorce from L.D.'s father in February 1992 and moved to the U.S. Virgin Islands. The parents shared custody of L.D. for a two-year period after the divorce, after which time they returned to court, each seeking a greater role in L.D.'s parenting. The Vermont family court ultimately revoked the prior custody arrangement and awarded L.D.'s father full custody. The divorce decree entered by the Addison Family Court on July 26, 1994 provides:
 
 
 4
 The court allocates all legal rights and physical rights regarding the choice of schooling for the child ... to the father. Such rights shall include the right to choose the school location, and participate in all parent teacher conferences of decision making with full authority on behalf of the child.... [The father] shall have the right to make all decisions regarding the child's health and safety while in his care during the school year.
 
 
 5
 The mother shall have a right to reasonable information regarding the child's progress in school and her health and safety.
 
 
 6
 . . . .
 
 
 7
 The Court places the parental rights and responsibilities for the child ... both legal and physical fully with the defendant-father....
 
 
 8
 This ruling was affirmed by the Vermont Supreme Court.
 
 
 9
 From the fall of 1994 until June 1998, L.D. attended the Robinson Elementary School ("Robinson") in Starksboro, Vermont. Robinson is part of the Starksboro School District ("SSD") and the Addison Northeast Supervisory Union ("ANSU"). From February 1996 until June 1998, officials at Robinson assessed L.D. in connection with a suspected disability. In January 1998, the ANSU Evaluation and Planning Team determined that L.D. was not eligible for special education under the IDEA, but that she did have Attention Deficit Disorder. ANSU evaluated L.D. to determine what accommodations would be appropriate under the Rehabilitation Act of 1973. Plaintiff Taylor was not notified of any of the meetings or evaluations that were conducted as part of this assessment, nor was she informed that the school suspected that L.D. suffered from a disability. Moreover, although Taylor requested L.D.'s school records in June 1998, Robinson did not provide Taylor with L.D.'s special education records. Taylor eventually received the special education records from the Weybridge School District in 1999.
 
 
 10
 L.D. and her father moved to Weybridge, Vermont in the summer of 1998. That September, L.D. commenced fourth grade at the Weybridge Elementary School, which is part of the Addison Central Supervisory Union ("ACSU"). The Weybridge School District formed an Education Support Team to evaluate L.D. for disabilities. In October and November 1998, Taylor traveled to Weybridge to attend what she believed were parent-teacher conferences to discuss L.D.'s academic and social difficulties. She was not informed that, in fact, these meetings were being conducted in order to complete L.D.'s preliminary disability evaluation. Throughout the remainder of the academic year, meetings and assessments of L.D. continued and a "Notice and Consent for Special Education Evaluation" was issued by the Weybridge School District, without any notice to the plaintiff.
 
 
 11
 In May 1999, in response to letters Taylor had sent to both the ANSU and ACSU, the Weybridge Elementary School finally sent her complete copies of L.D.'s educational records. It was after reviewing these records that Taylor first realized that the school district suspected that L.D. suffered from a disability.
 
 
 12
 During that same month, Weybridge psychologist Patricia Messerle began her disability evaluation. Messerle contacted the plaintiff, explaining that she had been hired by ACSU to help L.D. become more successful in school, and that she needed information on L.D.'s "actual temperament from birth." Messerle issued her completed report on July 2, 1999, in which she concluded that L.D. qualified for special education due to her emotional-behavioral problems. Taylor received a copy of Messerle's evaluation on July 19, 1999. On August 25, 1999, she wrote to Weybridge with concerns regarding the accuracy of the report and asked for certain factual corrections. Some, but not all, of the requested changes were made.
 
 
 13
 On July 9, 1999, an Individualized Education Program ("IEP") team consisting of L.D.'s father, stepmother, Messerle, Weybridge Elementary School principal Christina Johnson, ACSU Learning Specialist Amy Brown, and L.D.'s fourth grade teacher determined that L.D. suffered from an emotional-behavioral disability under Vermont Department of Education Regulation 2362.1(h). On August 30, 1999, the IEP team met to create L.D.'s first IEP, and on September 7, they sent L.D. for a neuropsychological evaluation at the Dartmouth Medical School. Although Taylor was later sent copies of the minutes from the August 30 meeting and the report issued by the Dartmouth Medical School, she was not informed in advance that any of these meetings or evaluations were to take place.
 
 
 14
 On September 3, 1999, Taylor wrote to James Lombardo, an ACSU official, alleging forty-five violations of her rights under federal and state law. Taylor asked to be included as a member of L.D.'s IEP team, for access to L.D.'s educational records, and to be allowed input into the content of those records. She sent a courtesy copy of this letter to the Commissioner of the Vermont Department of Education ("VDOE"), the federal Department of Education, and various ANSU and ACSU officials. On September 10, 1999, Taylor sent a follow-up letter to ACSU, which she again copied to the federal and state Departments of Education.
 
 
 15
 On October 1, Weybridge's legal counsel informed Taylor that the school would provide her with information on L.D.'s progress, that it would consider information and input from her that did not contradict input received from L.D.'s father, and that she would be given notice of and allowed to attend future meetings. Taylor did participate in subsequent meetings by phone, although she contends that she did not receive the background information she needed in order to take part in them fully.
 
 
 16
 On October 31, 1999, Taylor demanded an Independent Educational Evaluation ("IEE"), pursuant to 20 U.S.C. § 1415(b)(1), 34 C.F.R. § 300.502[1] and Vermont Special Education Rule 2364.3.4. The federal regulations permit "a parent" who disagrees with a public agency's evaluation either to initiate a hearing in which the agency must show that its initial evaluation was appropriate or to obtain a second IEE at public expense. 34 C.F.R. § 300.502(b)(2). This request was discussed at a subsequent IEP meeting in November. As L.D.'s father opposed further evaluation, and the team likewise concluded that further evaluation would impact L.D. negatively, Taylor's request was denied. Taylor then filed a Request for a Due Process Hearing with the Commissioner of the VDOE to compel Weybridge to substantiate its determination that L.D. was "seriously emotionally disturbed." A VDOE hearing officer dismissed the petition on the ground that, as a result of the Addison Family Court's custody order, plaintiff lacked legal standing to pursue any claim under the IDEA.
 
 
 17
 In October and December 1999, plaintiff again notified the school that she believed that L.D.'s educational file contained inaccurate information and asked that the file be amended. Specifically, Taylor sought to eliminate any reference to L.D.'s stepmother as the child's "mother" or "parent," among other changes. Weybridge did not respond to Taylor's letters but on February 4, 2000, Taylor received a copy of a letter addressed to L.D.'s father. The letter stated that the school had removed certain letters written by Taylor from L.D.'s files but, pursuant to the father's written request, would not amend the school records further. Taylor's petition for a hearing to challenge the content of L.D.'s records was denied by ACSU on the ground that, as Taylor lacked decision-making authority for L.D., there were "no justiceable [sic] issues to be heard by a Hearing Officer."
 
 
 18
 Taylor brought suit pro se in federal court against (1) the VDOE and the VDOE Commissioner; (2) ANSU, the SSD, and SSD officials ("the ANSU defendants"); and (3) ACSU, the Weybridge School District, and Weybridge school officials ("the ACSU defendants").[2] In count one, Taylor sought an order compelling the Weybridge School District to demonstrate the appropriateness of its disability determination pursuant to 34 C.F.R. § 300.502, as well as compensatory and punitive damages for defendants' IDEA violations. In count two, Taylor asked that the Weybridge School District be compelled to ensure that L.D.'s educational records contain accurate information pursuant to the procedures set forth in FERPA, the IDEA, and the implementing regulations; that the Weybridge School District be compelled to supply Taylor with all of L.D.'s educational records; and that the Court award Taylor compensatory and punitive damages for the violations of her rights under FERPA and the IDEA with respect to record access and record content. Although FERPA does not contain an implied direct cause of action, pursuant to Fay v. S. Colonie Central School District, 802 F.2d 21, 33 (2d Cir.1986), Taylor brought her FERPA action under 42 U.S.C. § 1983. Taylor also claimed that the VDOE failed to adjudicate her administrative complaint, in violation of 34 C.F.R. §§ 300.600-662 and 20 U.S.C. § 1221e-3, and made numerous accusations that the ANSU defendants also violated FERPA and the IDEA, but did not seek a specific order as to either the VDOE or the ANSU defendants.
 
 
 19
 Pursuant to 28 U.S.C. § 636(c), the parties consented to have the case heard before Magistrate Judge Jerome J. Niedermeier. Defendants thereafter filed motions to dismiss under Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 12(b)(7). The magistrate judge granted defendants' motion to dismiss pursuant to Rule 12(b)(6), holding that, as a non-custodial parent, Taylor lacked standing under the IDEA and FERPA. Taylor v. Vt. Dep't of Educ., No. 2:00-CV-143 (D.Vt. Apr. 4, 2001). Five days after the entry of judgment, however, the magistrate judge notified the parties that his daughter had been employed since January 1, 2001 as a teacher at defendant Robinson Elementary School. Her supervisor, Mary Heins, and her ultimate employer, ANSU, were also named defendants. Judge Niedermeier admitted that he had been aware that his daughter had been hired by Robinson Elementary School, but "did not focus on that fact in relation to this case until yesterday." Taylor did not move for recusal or for reconsideration of the judgment. Instead, on May 3, she noticed her appeal.
 
 DISCUSSION
 
 20
 Taylor has brought three general types of claims under the IDEA and FERPA. First, she demands that the ACSU defendants perform an Independent Educational Evaluation of L.D. Second, she asks to be given access to all of her daughter's educational records. Third, she seeks to challenge the content of her daughter's education records pursuant to 34 C.F.R. § 99.21. She also requests compensatory damages for violations of her rights under the IDEA and FERPA, including defendants' previous and continuing refusal to give her access to her daughter's records or other information regarding her daughter's education and health. We address each claim in turn.
 
 I. Standard of Review
 
 21
 We review a district court's grant of a motion to dismiss a complaint pursuant to Fed.R.Civ.P. 12(b)(6) de novo. Todd v. Exxon Corp., 275 F.3d 191, 197 (2d Cir.2001). In ruling on a Rule 12(b)(6) motion, we accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001). Our consideration is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference. Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.1999). We may also look to public records — such as the state court's divorce decree, which we note was also incorporated in complaint by reference — in deciding a motion to dismiss. See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir.1998); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991).
 
 
 22
 "Since most pro se plaintiffs lack familiarity with the formalities of pleading requirements, we must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel.... In order to justify the dismissal of the plaintiffs' pro se complaint, it must be beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." Lerman v. Bd. of Elections, 232 F.3d 135, 139-40 (2d Cir.2000) (internal citations, quotation marks and footnote omitted), cert. denied, 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001).
 
 
 23
 II. Taylor's Standing to Request an Independent Educational Evaluation
 
 
 24
 It is uncontested that one of the primary purposes of the IDEA is to "to ensure that the rights of children with disabilities and parents of such children are protected," 20 U.S.C. § 1400(d)(1)(B), including a parent's right to demand an IEE, see 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502. Yet the invocation of this general statutory purpose is of little assistance in helping us determine whether Taylor is entitled to exercise parental rights under the statute. Whether Taylor may avail herself of the IDEA's procedural protections in this case depends upon whether Taylor is considered a "parent" within the meaning of the Act. Unfortunately, neither the IDEA nor its federal regulatory scheme are models of clarity.
 
 
 25
 The IDEA was enacted to assist states in providing special education and related services to children with disabilities, see 20 U.S.C. § 1411(a)(1), by adopting an approach that has been termed "cooperative federalism." See, e.g., Little Rock Sch. Dist. v. Mauney, 183 F.3d 816, 830 (8th Cir.1999); Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 151 (3d Cir.1994). Under the IDEA, a participating state is entitled to receive federal funding if it has in effect policies and procedures designed to ensure, among other things, that children with disabilities are "identified and evaluated," that "a free, appropriate public education is available to all children with disabilities," that the state is working towards "providing full educational opportunity to all children with disabilities," and that "children with disabilities and their parents are afforded the procedural safeguards" provided under the Act. 20 U.S.C. § 1412.
 
 
 26
 The Act does not usurp the state's traditional role in setting educational policy, however. Rather, it is left to the individual states to determine how to implement the statute's goals. Burlington v. Dep't of Educ., 736 F.2d 773, 784 (1st Cir.1984) ("`Cooperative federalism' in this context, then, allows some substantive differentiation among the states in the determination of which educational theories, practices, and approaches will be utilized for educating disabled children with a given impairment."), aff'd sub nom. Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The statute "incorporates state substantive standards as the governing federal rule" if they are consistent with the federal scheme and meet the minimum requirements set forth by the IDEA. Mrs. C. v. Wheaton, 916 F.2d 69, 73 (2d Cir.1990); see also Antkowiak v. Ambach, 838 F.2d 635, 641 (2d Cir.1988) (same). "It seems plain that the Congress drew the procedural and substantive contours of education for disabled children, but left the shading and tinting of the details largely to the states. States are responsible for filling in the numerous interstices within the federal Act through their own statutes and regulations." Burlington, 736 F.2d at 785.
 
 
 27
 Consistent with this broad-outline approach, prior to 1997 the IDEA did not contain any definition of the term "parent." The statute was amended by the Individuals with Disabilities Education Act Amendments for 1997, Pub.L. No. 105-17, 111 Stat. 37, to include the following provision:
 
 
 28
 The term "parent" —
 
 
 29
 (A) includes a legal guardian; and
 
 
 30
 (B) except as used in sections 1415(b)(2) and 1439(a)(5) of this title, includes an individual assigned under either of those sections to be a surrogate parent.
 
 
 31
 20 U.S.C. § 1401(19). By its terms, this statutory provision is not exhaustive. Clearly, legal guardians and educational surrogates are not the only persons entitled to the IDEA's procedural protections. Even if the use of the expansive term "includes" did not carry with it the strong implication that the statute's definition of parent encompassed more than the two categories specifically referenced, we would find it difficult to credit a reading that excluded natural parents from the list of persons who could exercise parental rights under the statute.[3] Indeed, the legislative history indicates that this definition was added merely so that "most references to `guardian' [could be] deleted throughout the act when accompanied by the term `parent.'" S. Rep. 104-275, at 32 (1996) (explaining a proposal to enact an identical amendment in S. 1578).[4] Thus, the statutory language provides us with little assistance.
 
 
 32
 The Department of Education's current set of regulations implementing the IDEA, effective since 1999, contains a more comprehensive definition of parent:
 
 
 33
 (a) General. As used in this part, the term parent means —
 
 
 34
 (1) A natural or adoptive parent of a child;
 
 
 35
 (2) A guardian but not the State if the child is a ward of the State;
 
 
 36
 (3) A person acting in the place of a parent (such as a grandparent or stepparent with whom the child lives, or a person who is legally responsible for the child's welfare); or
 
 
 37
 (4) A surrogate parent who has been appointed in accordance with § 300.515.
 
 
 38
 (b) Foster parent. Unless State law prohibits a foster parent from acting as a parent, a State may allow a foster parent to act as a parent under Part B of the Act if —
 
 
 39
 (1) The natural parents' authority to make educational decisions on the child's behalf has been extinguished under State law; and
 
 
 40
 (2) The foster parent —
 
 
 41
 (i) Has an ongoing, long-term parental relationship with the child;
 
 
 42
 (ii) Is willing to make the educational decisions required of parents under the Act; and
 
 
 43
 (iii) Has no interest that would conflict with the interests of the child.
 
 34 C.F.R. § 300.20 (emphasis added).[5]
 
 44
 The regulation does not purport to list all those who are granted rights under the statute. In fact, by using the disjunctive, it indicates exactly the opposite — that the listed persons may or may not be entitled to exercise parental rights under the statute. Hence, the natural reading is that the federal regulation establishes a range of persons who may be considered a parent for purposes of the IDEA, but does not require that any and all such persons must be granted statutory rights.
 
 
 45
 Plaintiff nonetheless claims that, under § 300.20, natural parents retain their IDEA rights unless the state brings a proceeding to terminate their parental status.[6] We cannot accept such a reading of the regulation. Section 300.20 does not state, for example, that all the persons listed as possible parents possess standing to bring a claim under the IDEA until their parental rights are permanently revoked. Indeed, such a construction of the regulation would lead to the absurd result that natural parents, guardians, and persons acting in the place of a parent may all exercise the same rights under the IDEA simultaneously. Cf. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("[I]nterpretations... which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). The Department of Education could not have intended that there would be a superfluity of parties able to exercise authority over the child under the regulation simultaneously, each of whom may have conflicting ideas with respect to the child's education, with no means of choosing among them.
 
 
 46
 Nor is this problem solved if we assume that the regulation sets up a hierarchy, so that natural parents presumptively enjoy privileges under the statute while the other persons listed in § 300.20(a) may exercise IDEA rights only when there has been a complete termination of a natural parent's status or when the natural parents are deceased. Not only is such a reading contrary to a literal reading of the regulation, this interpretation would also create internal inconsistencies. Cf. Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir.2001) ("[W]hen determining which reasonable meaning [of ambiguous text] should prevail... absurd results are to be avoided and internal inconsistencies ... must be dealt with.") (internal citations and quotation marks omitted). Section 300.20(b), for example, imposes additional conditions that must be met before foster parents may exercise parental rights. Among them is the requirement that "[t]he natural parents' authority to make educational decisions on the child's behalf has been extinguished under State law." 34 C.F.R. § 300.20(b)(1). The regulation therefore allows a foster parent to exercise parental rights under the IDEA when both parents have lost rights over educational decision-making, even if this has been accomplished by something less than an irrevocable termination of the parent-child relationship. We find it improbable that the regulation would permit foster parents to exercise rights over children in the absence of a complete termination of parental rights, yet mandate that guardians, grandparents, stepparents or other persons could act in a parent's stead only when the parent-child relationship has been annulled.
 
 
 47
 The only way to read the regulation so that it is intelligible is with reference to state law. The regulation does not establish a method for choosing which of the possible parents is entitled to exercise rights under the statute. Given the nature of the statutory scheme, we look to state law to fill this gap and to establish which potential parent has authority to make special education decisions for the child. This conclusion is supported by the fact that the regulation refers to adoptive parents, legal guardians, and other persons "legally responsible for the child's welfare." None of these concepts is given content in federal law; rather, state domestic law assigns these rights. Thus, the regulation explicitly relies upon the state to assign parental rights.
 
 
 48
 We acknowledge that the federal regulations are inartfully drafted. To the extent that there is ambiguity, we may look to how the federal Department of Education has construed its own regulation. An agency's consistent interpretation of its regulations is to be given controlling weight unless plainly erroneous or inconsistent with the regulation. See, e.g., Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Levy v. Southbrook Int'l Inv., Ltd., 263 F.3d 10, 14 (2d Cir.2001), cert. denied, ___ U.S. ___, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002); Esden v. Bank of Boston, 229 F.3d 154, 168 (2d Cir.2000).[7] In a 1987 policy letter, the Department of Education's Office of Special Education Programs ("OSEP") stated:
 
 
 49
 The question of which divorced parent should be allowed to perform parental functions under the [IDEA] is not properly a matter for OSEP to decide. Rather, this is a matter for State or local divorce courts. Just as these courts deal with matters of custody, they can appropriately deal with matters related to the responsibility for making educational decisions on behalf of the child. OSEP would not seek to create a rule intruding on the jurisdiction of the courts and State family law in this area.
 
 
 50
 As OSEP's interpretation is perfectly consistent with both the gap left in the regulations and the strong presumption that issues of domestic relations fall within the traditional sphere of state authority, cf. Rose v. Rose, 481 U.S. 619, 625, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987), we accord deference to the Department of Education's decision that the allocation of parental rights under the IDEA is best left to local domestic law.[8]
 
 
 51
 Our conclusion is further reinforced by caselaw. The only other circuit court decision to have addressed this precise issue has likewise held that the extent of a natural parent's rights under the IDEA must be determined with reference to state law. See Navin v. Park Ridge Sch. Dist. 64, 270 F.3d 1147, 1149 (7th Cir.2001). In Navin, the natural father of a child with a disability sought to bring a due process challenge to the school district's IEP. In analyzing whether the non-custodial father had standing to bring an action under the IDEA, the Seventh Circuit looked to the rights that the father retained under a state custody decree. Id. ("If the divorce decree had given [the mother] not only custody but also every instrument of influence over [the child's] education, then [the father would have no claim under the IDEA]. Although the IDEA grants rights to `parents,' ... nothing in the IDEA overrides states' allocation of authority as part of a custody determination."). Finding that, although the mother had authority to make final educational decisions, the father nonetheless retained the right under the custody decree to be involved in and to influence his son's education, the Navin court remanded for the district court to determine whether the father's wishes were incompatible with the mother's.[9]
 
 
 52
 Having determined that state law will inform our resolution of the standing issue, we now look to Taylor's parental rights under Vermont law. Vermont's implementing regulations comport with the requirements set forth in the IDEA, and in fact substantially mirror the federal regulations:
 
 
 53
 Whenever the words "parent" or "parents" appear in these rules, the words shall mean, as appropriate:
 
 
 54
 (a) A biological or adoptive parent;
 
 
 55
 (b) A legal guardian, but not the state if the student is in the custody of the Commissioner of Social and Rehabilitative Services;
 
 
 56
 (c) A person who is acting as a parent, such as a grandparent or stepparent with whom the child lives and who is legally responsible for the child;
 
 
 57
 (d) A foster parent who has been appointed the educational surrogate parent by the Vermont Educational Surrogate Parent Program; or
 
 
 58
 (e) Educational surrogate parent.
 
 
 59
 Vermont Board of Education Rule 2360.3 (emphasis added). In applying this regulation, Vermont looks to its domestic law in deciding when it would be "appropriate" to allow a natural parent to exercise rights granted by the IDEA. Vermont therefore does not allow natural parents whose legal authority to make educational decisions on behalf of a child has been terminated by operation of local domestic law to challenge an IEP determination. See, e.g., In re T.C., 25 I.D.E.L.R. 1245 (Vt. SEA 1997); In re Randolph Sch. Dist., E.H.L.R. 509:183 (Vt. SEA 1987). This potion is consistent with the implementation of 34 C.F.R. § 300.20 by other states. See, e.g., In re N. Allegheny Sch. Dist., 26 I.D.E.L.R. 774 (Pa. SEA 1997); In re Andalusia City Bd. of Educ., 22 I.D.E.L.R. 666 (Ala. SEA 1995).
 
 
 60
 In contrast to the facts of the Navin case, here Taylor's parental right to participate in her daughter's education has been revoked by a Vermont family court. Moreover, the father, upon whom Vermont has bestowed this legal authority, has opposed the due process hearing requested by Taylor as against the child's best interests. As Taylor does not have the authority to make educational decisions on behalf of L.D., we agree that she lacks standing to demand a hearing under the IDEA on the appropriateness of defendants' IEP evaluation.[10]
 
 III. Taylor's Record-Access Claims
 
 61
 Taylor next appeals from the district court's ruling that she lacks standing to pursue her record-access claims under FERPA and the IDEA. FERPA commands that a parent must be permitted to review and inspect a child's educational records.[11] 20 U.S.C. § 1232g(a)(1)(A). The IDEA similarly allows parents access to records collected or maintained pursuant to that statute. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.562. Taylor alleges that the ACSU and ANSU defendants violated these provisions, and she seeks an order compelling the Weybridge School District to provide her "with copies of all of L.D.'s educational records requested by Plaintiff." She also requests monetary damages for violations of her FERPA and IDEA record-access rights by the ACSU and ANSU defendants.
 
 
 A. Taylor's FERPA claim
 
 
 62
 Before considering the merits of Taylor's FERPA claim, we must first determine whether Taylor may bring a § 1983 action for an alleged violation of FERPA's record-access provisions. At the time Taylor filed her complaint, it was settled law in this Circuit that FERPA's record-access provisions created rights enforceable through a § 1983 action. See Fay v. S. Colonie Cent. Sch. Dist., 802 F.2d 21, 33 (2d Cir.1986) (allowing plaintiff to recover actual damages for a violation of FERPA's record-access provisions). Subsequent to oral argument in this case, however, the Supreme Court handed down a decision which calls Fay's continuing validity into question. In Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Court explicitly overturned this Circuit's decision in Brown v. City of Oneonta, 106 F.3d 1125 (2d Cir.1997), and held that the non-disclosure provisions of FERPA, 20 U.S.C. § 1232g(b)(1), do not confer federal rights enforceable through a § 1983 action. 122 S.Ct. at 2271-72 & n. 2. We ordered additional briefing from the parties to help us resolve whether, in light of Gonzaga, Fay is still good law. Cf. Finkel v. Stratton Corp., 962 F.2d 169, 174-75 (2d Cir.1992) (noting that one panel may revisit a prior panel's decision if an intervening Supreme Court decision casts doubt on the prior holding). For the reasons that follow, we hold that Gonzaga compels the conclusion that Fay is no longer good law.
 
 
 63
 Several other circuits have stated in dicta and without discussion that Gonzaga applies to FERPA broadly, rather than only to the non-disclosure provisions of § 1232g(b). See Mo. Child Care Ass'n v. Cross, 294 F.3d 1034, 1040 n. 8 (8th Cir. 2002) ("In Gonzaga, the Court holds that [FERPA], which provides for a review board established by the Secretary of Education to hear individual complaints of violations of the statute's provisions, does not create any individual rights ... that are enforceable in private actions under § 1983."); United States v. Miami Univ., 294 F.3d 797, 809 n. 11 (6th Cir.2002) ("In Gonzaga University v. Doe, the Supreme Court held that the FERPA does not create personal rights that an individual may enforce through 42 U.S.C. § 1983."). But cf. Blessing v. Freestone, 520 U.S. 329, 342, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (holding that the proper inquiry in determining whether a particular statute is privately enforceable is not whether a statute "as an undifferentiated whole" grants an enforceable right to a particular class of plaintiffs, but rather whether a specific provision of the statute confers such rights). Although Gonzaga's discussion does appear to be limited to the § 1232g(b) non-disclosure provisions, we need not determine whether Gonzaga's express holding applies to § 1232g in its entirety because, applying the analysis set forth in Gonzaga, we conclude that plaintiff does not have the personal right required for a § 1983 claim under § 1232g(a).
 
 
 64
 Gonzaga clarifies that "[a] court's role in discerning whether personal rights exist in the § 1983 context should ... not differ from its role in discerning whether personal rights exist in the implied right of action context." 122 S.Ct. at 2276. Under both tests, we must initially decide if the statutory language "unambiguously confer[s] an enforceable right" upon an identifiable class of beneficiaries. Id. at 2275 (quoting Suter v. Artist M., 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)). Only after this threshold issue is decided do the standards diverge. Id. at 2274. Under the implied cause of action doctrine, a court must additionally inquire whether Congress intended to create a private remedy, see Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), while under our § 1983 analysis, we determine if Congress foreclosed a § 1983 remedy either expressly or impliedly through the creation of a comprehensive administrative enforcement scheme, see Blessing, 520 U.S. at 341, 117 S.Ct. 1353.
 
 
 65
 In Fay, this Circuit ruled that FERPA's record-access provisions, 20 U.S.C. § 1232g(a)(1), do not create an implied cause of action but could support a suit under § 1983. 802 F.2d at 33. Fay did not address the threshold issue identified by the Gonzaga Court in rendering either of these holdings. Citing to Girardier v. Webster College, 563 F.2d 1267, 1276-77 (8th Cir.1977), we based our conclusion that FERPA does not contain an implied cause of action on the statute's failure to evince a Congressional intent to create a privately enforceable remedy. Id. With respect to the issue whether FERPA could be enforced pursuant to § 1983, Fay implicitly assumed that § 1232g(a)(1) conferred a federal right, and passed immediately to the question of whether "Congress... create[d] so comprehensive a system of enforcing the statute as to demonstrate an intention to preclude a remedy under section 1983." 802 F.2d at 33. Finding that it did not, we held that the record-access provisions were enforceable under § 1983. Id.
 
 
 66
 Because Fay did not explicitly apply the standard announced by the Gonzaga Court — that is, whether the statutory language unambiguously confers a federal right on a class of beneficiaries — we must conduct our own analysis of § 1232g(a)(1). That analysis begins with Gonzaga's discussion of § 1232g(b)(1).
 
 
 67
 In Gonzaga, the Supreme Court examined the specific language of FERPA's non-disclosure provisions, 20 U.S.C. § 1232g(b)(1),[12] as well as the structure of the statute, and stated that "we have never before held, and decline to do so here, that spending legislation drafted in terms resembling those of FERPA can confer enforceable rights." 122 S.Ct. at 2273. The Supreme Court held, first, that the non-disclosure provisions "entirely lack the sort of `rights-creating' language critical to showing the requisite congressional intent to create new rights." Id. at 2277 (quoting Sandoval, 532 U.S. at 288-89, 121 S.Ct. 1511). The Court contrasted subsection (b) to the individually-focused statutes the Court had previously found privately enforceable. Id. (citing Cannon v. Univ. of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (holding that an implied private cause of action exists under Title IX, which states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied to the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance")). The Court noted that the non-disclosure provisions are both directions to the Secretary of Education and commands to make no funds available to educational institutions that have in place the disfavored policy or practice, thus suggesting an aggregate focus rather than an emphasis on individual rights. Id. ("Th[e] focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of `individual entitlement' that is enforceable under § 1983.") (quoting Blessing, 520 U.S. at 343, 117 S.Ct. 1353).
 
 
 68
 The records-access provisions at issue here read, in pertinent part:
 
 
 69
 No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children. If any material or document in the education record of a student includes information on more than one student, the parents of one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material. Each educational agency or institution shall establish appropriate procedures for the granting of a request by parents for access to the education records of their children within a reasonable period of time, but in no case more than forty-five days after the request has been made.
 
 
 70
 20 U.S.C. § 1232g(a)(1)(A). Section 1232g(a)(1)(C) lists the materials that will not be made available to students, which includes documents to which a student has explicitly waived his or her "right of access." Id. § 1232g(a)(1)(C)(iii). Finally, § 1232g(a)(1)(D) provides that "[a] student or a person applying for admission may waive his right of access to confidential statements."
 
 
 71
 Section 1232g(a)(1)(A) thus combines elements of both the funding-prohibition language that the Gonzaga Court held does not confer an individual right and the individually focused language that evidences an intent to create an enforceable right. The records-access provisions, like the non-disclosure provisions, speak directly to the Secretary of Education. In this respect, the statute focuses on the prohibition of federal funding. While the remainder of § 1232g(a)(1)(A) does not exclusively concern actions to be taken by the Secretary of Education, the language of the second sentence can be construed as a more detailed descriptor of the general policy, announced in the first sentence, that educational institutions are required to implement with respect to record access. Thus, rather than directly conferring rights on parents, the second sentence can be read as acting as a limitation on which records schools should make available.
 
 
 72
 Although the references to a parent's "right" in the funding-prohibition section of § 1232g(a) admittedly place a greater emphasis on the benefitted class of parents than does § 1232g(b), the Gonzaga Court noted that a mere reference to a parental "right" is not determinative:
 
 
 73
 [The dissent] would have us look to other provisions in FERPA that use the term "rights" to define the obligations of educational institutions that receive federal funds.... [The dissent] then suggests that any reference to "rights," even as a shorthand means of describing standards and procedures imposed on funding recipients, should give rise to a statute's enforceability under § 1983. This argument was rejected in Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 18-20, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (no presumption of enforceability merely because a statute "speaks in terms of `rights'"), and it is particularly misplaced here since Congress enacted FERPA years before [Maine v.] [Maine v.] Thiboutot [, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)] declared that statutes can ever give rise to rights enforceable by § 1983.
 
 
 74
 122 S.Ct. at 2278 n. 7. Although the "rights" language of § 1232g(a) is stronger than that used in § 1232g(b), because the language in § 1232g(a) can be read as simply modifying the terms imposed on fund-receiving institutions, we cannot say that it creates an "unambiguously conferred right." Gonzaga, 122 S.Ct. at 2275 (emphasis added).
 
 
 75
 The Gonzaga Court also found significant that the non-disclosure provisions prohibited an "institutional policy or practice, not individual instances of disclosure." Id. at 2278. Section 1232g(a) likewise begins by making clear that it applies to institutions that have "a policy of denying, or which effectively prevent[], the parents of students ... the right to inspect and review the education records of their children." Again, while the record-access provisions may contain a greater individual focus than the non-disclosure provisions, in that institutions that "effectively prevent" parents from exercising their rights could do so on either an individual or an aggregate level, we do not find in this language an unambiguous expression of congressional intent to confer an individual right enforceable by § 1983.
 
 
 76
 Accordingly, because we find that Gonzaga compels the conclusion that FERPA's records-access provisions, § 1232(g)(a)(1), do not create a personal right enforceable under § 1983, we overrule Fay v. South Colonie Central School District, 802 F.2d 21 (2d Cir.1986), to the extent that our holding today contradicts it.[13]
 
 
 B. Taylor's IDEA claim
 
 
 77
 Our conclusion that Taylor may not pursue a records-access claim under FERPA does not end our inquiry, however, because Taylor also asserted a records-access claim under the IDEA.[14] A parent's rights under the IDEA must be determined with reference to the rights she retains under the state custody decree, see Navin, 270 F.3d at 1148-49, and Taylor retains important rights related to her daughter's education under the Vermont custody decree, specifically the right to "reasonable information regarding the child's progress in school and her health and safety." Because the custody decree has not "specifically revoked" her informational access prerogatives, Taylor may pursue her record-access claim under the IDEA.
 
 
 78
 Plaintiff alleges in her complaint that, although she made requests for her daughter's educational records on May 21, 1999, June 9, 1999, and August 25, 1999, the ACSU defendants have not supplied her with "counseling records of Wendy Sauder, supporting documentation provided by the District or other professionals in connection with assessments and evaluations, tests and test results, and various other documents and reasonable requests for explanations and interpretations of L.D.'s educational records." She also alleges that she had arranged with the ANSU defendants to travel to the Starksboro Elementary School in June 1998 in order to review all of her daughter's school records. When Taylor arrived, she was given access to some academic records but she was not shown L.D.'s special education files, nor any document referencing a suspected disability. The ANSU defendants have never provided plaintiff with the special education files; rather, these records were furnished to her for the first time by the Weybridge School District on May 5, 1999 — nearly a year later.
 
 
 79
 The ACSU defendants concede that Taylor is entitled to review L.D.'s educational records. They argue, however, first, that they have provided Taylor with all the records she sought, and, second, that Taylor has not sufficiently alleged that the access she had was unreasonable. They also contend that Taylor's record-access claim is unpreserved. Finally, the ANSU defendants argue that Taylor failed to exhaust her administrative remedies under the IDEA.
 
 
 80
 In Plaintiff's Opposition to Defendants' Addison Central Supervisory Union, John Murphy, Amy Brown, Weybridge School District and Christina Johnson Motion to Dismiss, Taylor, proceeding pro se, argued that defendants' motion papers "[do] not address Plaintiff's federal civil rights claims for violations of IDEA," and specifically cited to those paragraphs in her complaint alleging that the ACSU defendants had not provided her with the requested educational records. At the hearing on the motion to dismiss before the district court, plaintiff again argued that, under the custody decree, Taylor "retained a large bundle of residual rights. Number one, she retained all of her rights under FERPA, rights to access, to the educational records." Finally, Taylor briefed the record-access issue on appeal before this court. We therefore find that this claim has been adequately preserved.
 
 
 81
 The magistrate judge held that "plaintiff has offered no factual basis for her implied conclusion that the access that she did have to her daughter's educational records was not `reasonable,' as provided by the family court order." As an initial matter, we agree that Taylor is only entitled to "reasonable" information. "Reasonable" information does not mean every last cover letter, transmittal sheet, or scrap of paper that happens to be contained in L.D.'s files. Possibly it might not even cover more substantive original documents or notes if the information contained therein was substantially incorporated in reports or if plaintiff had been otherwise informed of their content.[15] Further, it does not place an affirmative obligation on defendants to create any documents or provide additional explanation. Nonetheless, we cannot say that, as a matter of law, Taylor's complaint fails to state a violation of her right to "reasonable" information to which she was entitled under the IDEA and the custody decree. See 34 C.F.R. § 300.562; 20 U.S.C. § 1415(b)(1).
 
 
 82
 Taylor alleges that the ACSU defendants have not given her certain of L.D.'s counseling records and test results. In response to a request by this Court for further clarification, Taylor has identified some of the "various other documents" that she claims have also been withheld: records from the Dartmouth Medical School, where L.D. was examined on September 7, 1999; records from Dr. Robert Jimerson, a former employee of the Counseling Services of Addison County who apparently met with L.D. four times in 1999; records from the Addison County Counseling Center Adventure Program; and records from Patricia Messerle. Our task is to determine whether, consistent with these allegations, there is at least a possibility that Taylor could be entitled to relief. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (internal quotation marks omitted). Although it is unclear what information is contained in these records, it is conceivable that denying plaintiff access to various medical records, counseling records, and test results during a period in which L.D. was being actively evaluated for an emotional disability cumulatively infringed upon plaintiff's right to reasonable information regarding her child's health and progress. Cf. King v. Crossland Sav. Bank, 111 F.3d 251, 259 (2d Cir.1997) ("[An] assessment of reasonableness generally is a factual question to be addressed by the [factfinder].").
 
 
 83
 Similarly, Taylor claims that the ANSU defendants denied her access to all records related to L.D.'s suspected disability, with the result that she was not made aware until nearly a year later that her daughter had been diagnosed with serious emotional and behavioral difficulties. Reading Taylor's pro se complaint liberally, we conclude that it is possible that this could constitute the type of "reasonable information regarding the child's progress in school and her health and safety" contemplated by the custody decree.
 
 
 84
 It remains to be seen whether any of the withheld documents is a record within the definition of 34 C.F.R. § 300.562, whether any failure to provide Taylor with these records was "reasonable," and whether such records were in fact furnished to Taylor. On this motion to dismiss, however, we do not decide whether plaintiff will prevail, but simply whether she is entitled to offer evidence to support her claims. See County of Suffolk v. First Am. Real Estate Solutions, 261 F.3d 179, 187 (2d Cir.2001). We therefore hold that the district court should not have granted defendants' motion to dismiss with respect to the IDEA records-access claim, at least without granting Taylor an opportunity to cure any alleged insufficiencies in the pleadings.[16]
 
 
 85
 Next, we turn to the ANSU defendants' argument that Taylor's claim is barred by her failure to exhaust her available administrative remedies under the IDEA.[17] Although Taylor exhausted her IDEA administrative remedies against the ACSU defendants pursuant to 20 U.S.C. § 1415(f),[18] she did not seek a due process hearing with respect to the ANSU defendants. The ANSU defendants now point to this omission as a bar to Taylor's action against them.
 
 
 86
 While exhaustion of state administrative remedies is generally not required prior to bringing a § 1983 action, see Patsy v. Bd. of Regents, 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), when a § 1983 action is brought to vindicate federal statutory rights, such an exhaustion requirement may be implicit in the statute allegedly violated. "[C]ourts are guided by congressional intent in determining whether application of the doctrine would be consistent with the statutory scheme. In determining whether exhaustion of federal administrative remedies is required, courts generally focus on the role Congress has assigned to the relevant federal agency, and tailor the exhaustion rule to fit the particular administrative scheme created by Congress." Id. at 502 n. 4, 102 S.Ct. 2557.
 
 The IDEA provides:
 
 87
 Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 ... the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.
 
 
 88
 20 U.S.C. § 1415(l). In situations where exhaustion of the IDEA's administrative remedies is mandated, the failure to do so deprives this court of subject matter jurisdiction over the plaintiff's claims. Hope v. Cortines, 69 F.3d 687, 688 (2d Cir.1995).
 
 
 89
 Plaintiff is nonetheless entitled to proceed with her claim under one, if not more, of the recognized exceptions to this requirement. In particular, exhaustion is not necessary under the IDEA where it would be futile to resort to the due process procedures or where "it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought)." Tirozzi, 832 F.2d at 756 (quoting from H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)). We agree with the district court that requiring exhaustion of administrative remedies would be futile in this case. When Taylor had previously attempted to exhaust her administrative remedies against the ACSU defendants, a Vermont hearing officer held that the due process proceeding was not the proper forum to seek redress for violations of parental rights under the IDEA and denied her standing to continue with her action. Moreover, plaintiff did not learn that the ANSU defendants had denied her access to L.D's special education records until May 1999, after she had obtained the special education files from another source. No purpose would have been served by bringing a due process challenge against the ANSU defendants at that point. Taylor already had the withheld records, and she could not have benefitted from any procedural reforms that a victory might have brought because her daughter no longer attended the school — and in fact had left the school district. See Heldman on Behalf of T.H. v. Sobol, 962 F.2d 148, 159 (2d Cir.1992) (holding that "it would be an exercise in futility to require [plaintiff] to exhaust the state administrative remedies" where plaintiff challenged a state administrative procedure, and the hearing officer would not have had the authority to alter the procedure); Eads ex rel. Eads v. Unified Sch. Dist. No. 289, 184 F.Supp.2d 1122, 1135-36 (D.Kan.2002) (holding that there is no need to exhaust IDEA remedies when only remedy sought is compensation for physical injury, and administrative remedies can provide only prospective educational benefits).
 
 
 90
 We do not intend by this holding to suggest that Taylor is excused from exhausting her administrative remedies against the ANSU defendants merely because she seeks money damages. A plaintiff cannot evade the IDEA's exhaustion requirement simply by framing his or her action as one for monetary relief. Polera v. Bd. of Educ., 288 F.3d 478, 488 (2d Cir.2002) ("The fact that Polera seeks damages, in addition to relief that is available under the IDEA, does not enable her to sidestep the exhaustion requirements of the IDEA."); see also Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 64 (1st Cir. 2002); Covington v. Knox County School System, 205 F.3d 912, 916-17 (6th Cir. 2000); Charlie F. v. Bd. of Educ., 98 F.3d 989, 992 (7th Cir.1996); N.B. v. Alachua County Sch. Bd., 84 F.3d 1376, 1378-79 (11th Cir.1996); cf. Booth v. Churner, 532 U.S. 731, 736-37, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (holding that, under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), statutory language requires exhaustion of administrative remedies as a prerequisite to civil suit for monetary damages, even if this type of relief is not available under the administrative process). But see Witte v. Clark County Sch. Dist., 197 F.3d 1271, 1275 (9th Cir.1999) (relying on language in the IDEA that requires exhaustion only when a plaintiff seeks "relief that is also available under the IDEA" in holding that exhaustion is not a prerequisite to suit for monetary damages) (internal quotation marks omitted); W.B. v. Matula, 67 F.3d 484, 495-96 (3d Cir.1995) (same). Even if plaintiffs may not obtain their preferred remedy through the administrative process, the IDEA's administrative remedies scheme is nonetheless critical because it "allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." Polera, 288 F.3d at 487 (quoting Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303 (9th Cir.1992)).
 
 
 91
 While the general rule is that plaintiffs seeking monetary damages must exhaust the IDEA due process procedures, the aforementioned exceptions to the IDEA's exhaustion requirement apply with equal force to any case arising under the statute. See Polera, 288 F.3d at 487; Tirozzi, 832 F.2d at 756. Hence, if plaintiffs can demonstrate that there is no relief available to them through the administrative process, they may avail themselves of the futility or inadequacy exceptions to the exhaustion requirement to the same extent as any other plaintiff. "`[R]elief available' [means] relief for the events, condition, or consequences of which the person complains, [even if] not necessarily relief of the kind the person prefers." Polera, 288 F.3d at 488 (quoting Charlie F., 98 F.3d at 992); see also BD v. DeBuono, 130 F.Supp.2d 401, 428-29 (S.D.N.Y.2000) (allowing claims of two plaintiffs who had not exhausted remedies to proceed, because by the time they became aware of their cause of action the children had aged out of the special education program, and therefore there was no redress possible under the administrative scheme); see also Booth, 532 U.S. at 736-37, 121 S.Ct. 1819 (holding that exhaustion is required under Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), because hearing officer had authority to take some action in response to the complaint, even if not the remedy sought). The plaintiff bears the burden of demonstrating futility. Polera, 288 F.3d at 488 n. 8.
 
 
 92
 In Polera, we rejected a plaintiff's argument that it would have been futile for her to exhaust administrative remedies. The plaintiff, a visually disabled student, had sued for monetary damages and equitable relief under the IDEA for the school district's alleged failure to provide her with a free appropriate public education. By the time the case reached us on appeal, the student had graduated from high school. Id. at 480. Polera relied upon the Sixth Circuit's decision in Covington, in which a student sought damages for injuries he suffered as a result of being locked in a small, airless room for a prolonged period by school officials. See Covington, 205 F.3d at 917 ("[I]n the unique circumstances of this case — in which the injured child has already graduated from the special education school, his injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole — proceeding through the state's administrative process would be futile and is not required before the plaintiff can file suit in federal court."). The Polera court found Covington distinguishable because the plaintiff student in that case could not have received relief even if he had immediately invoked administrative procedures. In contrast, Polera brought suit in her senior year of high school for injuries beginning ten years earlier. "[H]ad Polera pursued administrative procedures at the time of the alleged wrongdoing, she could have obtained the materials she needed and, perhaps, remedial tutoring or schedule adjustments to undo the effects of the wrong. For Polera, unlike the plaintiff in Covington, a fully effective remedy was available at the time; she simply chose not to pursue it." 288 F.3d at 490.
 
 
 93
 Unlike the plaintiff in Polera, Taylor did not deliberately delay in bringing her action. Rather, by the time she became aware of her cause of action, her daughter had been transferred from the ANSU school district. Had plaintiff pursued an administrative claim against the ANSU defendants immediately upon her discovery that they had concealed L.D.'s special education records, the hearing officer could have provided her with no relief against the ANSU defendants. The records in question had already been provided by the ACSU defendants and L.D. was no longer within the jurisdiction of the ANSU defendants. As Taylor seeks a remedy for a past injury, and the hearing officer lacked the authority to provide any relief for this injury, this case is more analogous to Covington than Polera.
 
 
 94
 There are additional factors that support plaintiff's futility argument. First and foremost, plaintiff's similar attempt to invoke the IDEA due process procedures against the ACSU defendants had failed for lack of standing. Any administrative challenge that Taylor brought would likely be disposed of on similar grounds. Moreover, although exhaustion generally may be advantageous because it "facilitates the compilation of a fully developed record by a factfinder versed in the educational needs of disabled children," Frazier, 276 F.3d at 61, if the hearing officer would have dismissed the claim for lack of standing, then we would have derived no such benefit from Taylor bringing an administrative claim. Thus, the traditional reasons for requiring exhaustion are not present in this case. Under these circumstances, we hold that Taylor is exempted from the exhaustion requirements of the IDEA on grounds of futility and inadequacy of remedy against the ANSU defendants.
 
 IV. Taylor's Record Amendment Claim
 
 95
 Taylor next alleges that the ACSU defendants deprived her of her right under FERPA, 20 U.S.C. § 1232g(a)(2), to challenge inaccuracies in her daughter's school records. The FERPA regulations provide:
 
 
 96
 (a) An educational agency or institution shall give a parent or eligible student, on request, an opportunity for a hearing to challenge the content of the student's education records on the grounds that the information contained in the education records is inaccurate, misleading, or in violation of the privacy rights of the student.
 
 
 97
 (b)(1) If, as a result of the hearing, the educational agency or institution decides that the information is inaccurate, misleading, or otherwise in violation of the privacy rights of the student, it shall:
 
 
 98
 (i) Amend the record accordingly; and
 
 
 99
 (ii) Inform the parent or eligible student of the amendment in writing.
 
 
 100
 (2) If, as a result of the hearing, the educational agency or institution decides that the information in the education record is not inaccurate, misleading, or otherwise in violation of the privacy rights of the student, it shall inform the parent or eligible student of the right to place a statement in the record commenting on the contested information in the record or stating why he or she disagrees with the decision of the agency or institution, or both.
 
 
 101
 34 C.F.R. § 99.21. Plaintiff's attempt to invoke the procedural protections of this rule was denied, as the magistrate judge determined that she lacked standing to make educational decisions for her daughter. For the reasons set forth below, we conclude that Taylor lacks standing to bring her record-amendment claim, and therefore do not reach the question of whether a plaintiff may bring a § 1983 action to enforce 20 U.S.C. § 1232g(a)(2).
 
 
 102
 In contrast to the IDEA regulations, the FERPA implementing regulations specifically address the question of a non-custodial parent's rights under the statute: "An educational agency or institution shall give full rights under the Act to either parent, unless the agency or institution has been provided with evidence that there is a court order, State statute, or legally binding document relating to such matters as divorce, separation, or custody that specifically revokes these rights." 34 C.F.R. § 99.4. In other words, the extent of Taylor's rights under FERPA must be determined with reference to the rights she retained under the decree.
 
 
 103
 The divorce decree clearly states that all legal rights over education lie with the father. The decision to bring a FERPA hearing to challenge the content of L.D.'s records certainly falls within the authority given to the natural father to make educational determinations on behalf of L.D. Plaintiff counters that her FERPA rights were not "specifically revoke[d]" by the divorce decree. It is not necessary, however, for the custody decree to state explicitly that it revokes "FERPA rights," nor recite the litany of all possible rights that have been abrogated. It is enough that the court determined that Taylor no longer has authority to make decisions related to the education of her daughter. Taylor's right to seek a hearing to challenge the content of her daughter's academic files has therefore been "specifically revoked" within the meaning of the regulation.[19]
 
 
 104
 V. VDOE's Failure to Adjudicate Plaintiff's Administrative Complaint
 
 
 105
 Plaintiff has also brought a claim against the VDOE for its failure to adjudicate her administrative complaint in a timely fashion, as required by 34 C.F.R. §§ 300.660-662.[20] The letters Taylor sent to the VDOE, included with her complaint, leads us to conclude that Taylor never triggered the administrative review process. Her letters were not directed to the VDOE. They were addressed to ACSU, with courtesy copies sent to ANSU, the federal Department of Education, the VDOE, Weybridge Elementary School, and Robinson Elementary School. There is nothing in these letters that would have put the VDOE on notice that Taylor was initiating Vermont's administrative complaint process. Taylor's remaining claim against the VDOE must therefore be dismissed.
 
 
 106
 VI. Qualified Immunity for the Individually-Named ACSU Defendants
 
 
 107
 Individual public officials are entitled to qualified immunity from claims for monetary damages if the statutory right infringed was not clearly established at the time of the violation or if it was objectively reasonable for officials to believe their acts did not infringe upon those rights. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); Vega v. Miller, 273 F.3d 460, 466 (2d Cir.2001) ("The qualified immunity defense requires consideration of the clarity of the law establishing the right allegedly violated and whether a reasonable person, acting under the circumstances then confronting a defendant, would have understood that the applicable law was being violated."), cert. denied, ___ U.S. ___, 122 S.Ct. 2295, 152 L.Ed.2d 1053 (2002).
 
 
 108
 In determining if a right has been clearly established, we consider (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court supported the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful. Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir.1991).
 
 
 109
 There is some evidence that Taylor's right to informational access was clearly established at the requisite level of particularity. The IDEA regulations speak not only to the rights parents generally possess to review their children's records, see Matula, 67 F.3d at 501 n. 13 (noting in dicta that a parent's right to review records under the IDEA is clearly established), but also to the fact that non-custodial parents continue to enjoy such rights. More significantly, Vermont state law on this point is unambiguous: "Access to records and information pertaining to a minor child, including but not limited to medical, dental, law enforcement and school records shall not be denied to a parent solely because that parent has not been awarded parental rights and responsibilities." Vt. Stat. Ann. tit. 15 § 670.
 
 
 110
 We nevertheless believe that a ruling on the availability of a qualified immunity defense would be premature. The qualified immunity issue in this case turns on factual questions that cannot be resolved at this stage of the proceedings. For example, "[t]he objective reasonableness of [the defendants'] acts depends in part on what information they had at the time." Brown, 106 F.3d at 1132. It is unclear what information the individual defendants possessed when they allegedly deprived plaintiff of her IDEA rights, or whether other facts may come to light that would render their actions objectively reasonable. Defendants may raise their qualified immunity defense again in a summary judgment motion, after suitable discovery.
 
 VII. Recusal of Magistrate Judge
 
 111
 Taylor raises for the first time on appeal the issue of the magistrate judge's disqualification. The defendants contend that Taylor has either waived or forfeited this claim because she did not move for recusal below, and that she is therefore precluded from bringing her recusal claim at this late date. We hold that plaintiff did not waive her recusal claim, but find no plain error in the magistrate judge's failure to recuse himself sua sponte.
 
 Federal law requires that:
 
 112
 (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 113
 (b) He shall also disqualify himself in the following circumstances:
 
 
 114
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
 
 
 115
 . . .
 
 
 116
 (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such person:
 
 
 117
 . . .
 
 
 118
 (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding.
 
 
 119
 28 U.S.C. § 455. Taylor argues that this requirement, directed at the judge, is not subject to waiver or estoppel. See Noli v. Comm'r, 860 F.2d 1521, 1527-28 (9th Cir. 1988); United States v. Sibla, 624 F.2d 864, 868 (9th Cir.1980) (applying plain error analysis). Our case law not only provides that a recusal claim under § 455 may be waived, however, but also that it can be forfeited if brought in an untimely fashion. See, e.g., United States v. Bayless, 201 F.3d 116, 127 (2d Cir.2000) (differentiating between forfeiture and waiver of a recusal claim); Polizzi v. United States, 926 F.2d 1311, 1321 (2d Cir.1991) (discussing waiver of recusal claims); Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987) ("[A] party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim."); In re Int'l Bus. Machs. Corp., 618 F.2d 923, 932 (2d Cir.1980) (reading timeliness requirement into § 455). If a recusal claim has been waived, as opposed to forfeited, the appellate courts are barred from entertaining it. Bayless, 201 F.3d at 127.
 
 
 120
 Taylor has not waived her recusal claim, because there has been no "renunciation — whether expressly through words or implicitly through behavior — of the right to seek recusal." Id. at 127. "[U]ntimeliness in making a motion for recusal can sometimes constitute the basis for finding an implied waiver." Id. In the present case, although Taylor should have brought a recusal motion before the magistrate judge in the first instance, we do not believe that this lapse is enough to extinguish irrevocably her right to pursue a recusal claim. In determining whether a § 455 motion is untimely, we look to whether "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the movant can demonstrate good cause for delay." United States v. Brinkworth, 68 F.3d 633, 639 (2d Cir.1995) (citations omitted). Taylor did not strategically delay in raising her recusal claim until after the district court rendered a final judgment. Cf. Int'l Bus. Machs., 45 F.3d at 643 (noting that the timeliness requirement "avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters"). The parties were not notified of the potential conflict until post-judgment. Since that time, the parties have not appeared before the magistrate judge, and there have been no further proceedings below in this case. Taylor raised her recusal claim in her brief on appeal, the first substantive papers filed in this case since she was notified of the magistrate judge's possible conflict of interest. Under these circumstances, we do not believe Taylor implicitly waived her recusal claim by an unwarranted delay or by abandonment. Cf. id. (holding that the rationale underlying the timeliness requirement was not implicated when case was in post-judgment phase and no matters were pending before the district court).
 
 
 121
 While the recusal claim has not yet been waived, our review of this issue is necessarily limited because plaintiff did not bring a motion for recusal below. Both parties urge us to review the magistrate judge's failure to recuse himself sua sponte for plain error. See Fed. R.Crim.P. 52(b); see also Bayless, 201 F.3d at 127; United States v. Schreiber, 599 F.2d 534, 536 (3d Cir.1979). In the civil context, however, we reverse only if there has been fundamental error. "Fundamental error is more egregious than the `plain' error that can excuse a procedural default in a criminal trial, and is so serious and flagrant that it goes to the very integrity of the [proceeding]." Jarvis v. Ford Motor Co., 283 F.3d 33, 62 (2d Cir.2002) (internal citation and quotation marks omitted); see also Shade v. Hous. Auth. of City of New Haven, 251 F.3d 307, 313 (2d Cir.2001) (noting that fundamental error is narrower than plain error doctrine). If the magistrate judge erroneously failed to recuse himself as required by § 455, we cannot say that this alleged error is so flagrant that it infected the integrity of the proceedings below. The fact that a judge's offspring is employed by a party does not require recusal per se. See Southwestern Bell Tel. Co. v. FCC, 153 F.3d 520, 523 (8th Cir.1998) (holding that recusal unnecessary where son was employed by a company with over 50,000 workers, had no financial interest in the company, and occupied a non-management position); Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864, 871 (9th Cir.1991) (same); Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556 (Fed.Cir.1989) (same). Rather, the resolution of this question turns on a factual inquiry as to whether the magistrate judge's child is in a position to be "substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(iii). On the limited factual record before us, we cannot say that the magistrate judge's failure to recuse himself even constituted error, let alone a "flagrant" error. Moreover, given the early stage of the proceedings, the fact that the only substantive motion decided by the magistrate judge was the motion to dismiss, which we have subjected to de novo review, and that the magistrate judge made no factual findings, the failure to recuse did not result in any discernible prejudice to plaintiff.
 
 CONCLUSION
 
 122
 For the reasons stated above, we affirm the dismissal of all claims against the VDOE. We also affirm the dismissal of the claims against the ANSU and ACSU defendants related to the provision of an IEE and to the contents of L.D.'s records and the FERPA record-access claim. We vacate the magistrate judge's judgment dismissing the plaintiff's IDEA record-access claims against the ANSU and ACSU defendants, and remand for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 The Honorable Lewis A. Kaplan, of the District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Under this regulation, "[a] parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1). "Independent educational evaluation means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question."Id. § 300.502(a)(3)(i).
 
 
 [2]
 Taylor proceededpro se below in opposing the motion to dismiss until October 25, 2000, when counsel entered an appearance on her behalf. She is also represented by counsel on appeal.
 
 
 [3]
 The congressional decision to adopt more encompassing language is particularly significant in light of the fact that the Department of Education had longstanding regulations in place defining the term "parent" broadly to include non-legal guardians such as persons acting in the place of a parent. Congress in fact referred approvingly to this broad regulatory definition when it amended the attorney's fees provisions of the IDEASee Handicapped Children's Protection Act of 1986, Pub.L. No. 99-372, 100 Stat. 796. The Senate Committee on Labor and Human Resources stated: "It is also the committee's intent that, consistent with section 300.10 of Title 34 of the Code of Federal Regulations (EHA regulations) the term `parent or legal representative' includes a person acting as a parent of a child or a surrogate parent who has been appointed in accordance with section 615(b)(1)(B) of the EHA. The term does not include the State if the child is a ward of the State." S.Rep. No. 99-112, at 14 (1985), reprinted in 1986 U.S.C.C.A.N. 1798, 1804; cf. Isaacs v. Bowen, 865 F.2d 468, 473 (2d Cir.1989) ("`[W]hen a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby.'") (quoting United States v. Bd. of Comm'rs, 435 U.S. 110, 134, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978)).
 
 
 [4]
 Prior to the 1997 amendments, IDEA provisions generally referred to the rights of "parents or guardians."See, e.g., 20 U.S.C. § 1412(7) (1990).
 
 
 [5]
 Prior to 1999, the federal regulations provided that "the term `parent' means a parent, a guardian, a person acting as a parent of a child, or a surrogate parent who has been appointed in accordance with Section 300.514. The term does not include the State if the child is a ward of the state." 34 C.F.R. § 300.13 (1997). A note to § 300.13 further stated that "[t]he term `parent' is defined to include persons acting in the place of a parent, such as a grandmother or stepparent with whom a child lives, as well as persons who are legally responsible for a child's welfare."
 
 
 [6]
 A proceeding to terminate parental rights differs in several fundamental respects from a custody decree granting legal authority over a child to one natural parent over another. A termination proceeding is an extraordinary proceeding that the state undertakes to divest a natural parent involuntarily of his or her legal status as a child's mother or father. In holding that states must afford natural parents constitutional due process in terminating parental status, the Supreme Court observed that such proceedings "sever completely and irrevocably the rights of parents in their natural child."Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). While Taylor does not have legal custody of L.D., and she has lost certain rights over her daughter under Vermont's custody decree, there is no suggestion that the mother-child relationship between Taylor and L.D. has been dissolved.
 
 
 [7]
 Plaintiff relies uponChristensen v. Harris County, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), in arguing that we should not give deference to an agency's interpretation of a regulation when that interpretation is contained in a policy letter. That case is inapposite, however. In Christensen, the Court first rejected the notion that Chevron deference was due an agency's informal interpretation of an ambiguous statute, and second held that deference to an agency interpretation of a regulation was required only if the regulation was ambiguous. Id. at 587-88, 120 S.Ct. 1655. Christensen does not overrule the longstanding rule regarding the deference generally owed to an agency's reading of its own regulations, however, and in fact distinguished Auer and Bowles on the ground that the agency's interpretation of the regulation at issue in Christensen was inconsistent with its unambiguous language. Id. In post-Christensen cases, this Circuit has continued to hold that the Auer/Bowles rule of deference is still in effect. See, e.g., Yourman v. Giuliani, 229 F.3d 124, 128 (2d Cir.2000) (relying on both Auer and Christensen for the rule that, absent a conflict between the agency's interpretation and the regulatory language, the agency's construction of the regulation is entitled to deference), cert. denied, 532 U.S. 923, 121 S.Ct. 1362, 149 L.Ed.2d 291 (2001).
 
 
 [8]
 Plaintiff contends that the OSEP policy letter is not controlling because it predates both the 1997 statutory amendments and the 1999 amendments to the regulations. In particular, plaintiff points to the fact that the definition of "parent" in the federal regulations was amended so that it now explicitly lists "natural" parents. Yet in enacting the 1999 regulations, the Department of Education repeatedly stated that the changes to the regulations were for purposes of clarification only and did not effect a substantive change in the lawSee 64 Fed.Reg. 12,406 (Mar. 12, 1999) ("The regulations have also been amended to incorporate relevant longstanding interpretations of the Act that have been addressed in nonregulatory guidance in the past and are needed to ensure a more meaningful implementation of the Act and its regulations for children with disabilities, parents, and public agencies. These interpretations are based on the statutory provisions of the IDEA that were in effect prior to the IDEA Amendments of 1997 and that were not changed by those Amendments."); cf. 65 Fed.Reg. 53,808, 53,809 (Sept. 5, 2000); 62 Fed.Reg. 55,032 (Oct. 22, 1997). Indeed, we find it implausible that the insertion of the word "natural" grants new rights to natural parents that they did not possess before. Were we to accept plaintiff's argument, we would be forced to conclude that prior to the 1999 amendments, natural parents did not have standing under the IDEA.
 
 
 [9]
 The plaintiff cites to two district court opinions to support her claim that non-custodial natural parents may participate in the IEP process unless there has been an official termination of their parental rightsSee W.T. v. Andalusia City Schs., 977 F.Supp. 1437, 1444 (M.D.Ala.1997) ("[U]nder its plain language, the IDEA gives to the `parents or guardian' of a child — regardless as to whether the parent or guardian has actual custody — the right to request a due-process hearing.... The fact that the custodial guardian at the time of the administrative proceedings disagreed with [the mother] did not necessarily abrogate [her] standing...."); Doe v. Anrig, 651 F.Supp. 424, 429 (D.Mass.1987) (holding that non-custodial father who had financial responsibility for son's education had right to participate in IEP process), vacated and remanded (Apr. 3, 1987). To the extent that these cases hold that natural parents may challenge educational decisions under the IDEA regardless of whether they have legal authority over the child, we find them unpersuasive.
 
 
 [10]
 Although Taylor's complaint alleged violations of her right to be notified of the disability evaluations and their outcome under the IDEA,see 20 U.S.C. §§ 1414(b)(1), 1415(b)(3), 1415(c), she has not pursued this argument on appeal. We therefore deem these claims waived, and do not consider whether Taylor's right to reasonable information regarding L.D.'s progress in school encompasses the right to notice under the IDEA.
 
 
 [11]
 Under FERPA, "[i]f circumstances effectively prevent the parent ... from exercising the right to inspect and review the student's education records, the educational agency ... shall [p]rovide the parent ... with a copy of the records requested[.]" 34 C.F.R. § 99.10(d)(1). "The educational agency ... shall respond to reasonable requests for explanations and interpretations of the records."Id. § 99.10(c).
 
 
 [12]
 The non-disclosure provisions of FERPA read, in pertinent part:
 No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization....
 20 U.S.C. § 1232g(b)(1).
 
 
 [13]
 Prior to filing, this opinion was circulated to all the judges of this Court, none of whom has objected to the overruling of our prior opinion
 
 
 [14]
 Although monetary damages are not available under the IDEA itself, a plaintiff may recover monetary damages for a violation of the IDEA pursuant to § 1983Polera v. Bd. of Educ., 288 F.3d 478, 483 & n. 5 (2d Cir. 2002).
 
 
 [15]
 For example, Taylor claims that she is entitled to an identification of all records released by the Weybridge School District to various outside consultants, presumably pursuant to 34 C.F.R. § 99.30, even though she has apparently received the reports prepared on the basis of those documents. We believe it unlikely that Taylor's right to "reasonable information regarding the child's progress in school and her health and safety" would extend this far
 
 
 [16]
 At oral argument, the ACSU defendants for the first time contended that Taylor's complaint is fatally defective because it does not allege that plaintiff was denied access to L.D.'s records as part of a policy or practice of the school or the school district. Under the IDEA, however, plaintiff may bring a civil action regardless of whether the access violation was pursuant to a "policy or practice" of the defendantsSee 20 U.S.C. §§ 1415(b)(1), (i)(2).
 
 
 [17]
 As we find that Taylor does not have standing to pursue her remaining claims, we address only whether Taylor was required to exhaust her administrative remedies against the ANSU defendants in order to pursue her IDEA record-access claim
 
 
 [18]
 Taylor brought a due process proceeding against the ACSU defendants in which she made substantially the same allegations as she does in her instant complaint. The hearing officer dismissed her claim for lack of standing. He ruled first that she lacked standing to challenge educational decisions regarding L.D. because of the custody decree. The hearing officer then cited to 20 U.S.C. § 1415(b)(6) for the proposition that because due process challenges are available only with respect to "the identification, evaluation, and placement" of the student in a special education program, "[t]o the extent that her grievances concern how the District has treatedher ... it must be concluded that there is no subject matter jurisdiction under special education due process procedures to address such grievances."
 
 
 [19]
 Taylor also brought suit for violations of the IDEA regulations that similarly allow challenges to the content of educational records collected or maintained under the IDEA. The federal regulations, promulgated pursuant to 20 U.S.C. §§ 1412(a)(8), 1417(c), grant parents the right to request amendments to educational records believed to be inaccurate or misleading. 34 C.F.R. § 300.567. If the educational agency denies this request, the parent may demand a hearing to challenge the content of the educational recordsId. § 300.568. For the reasons stated supra Section II(A), plaintiff lacks standing under the IDEA to make educational decisions regarding L.D., including the decision to challenge the accuracy of her educational records.
 
 
 [20]
 Although defendant VDOE claims that Taylor waived this claim by failing to raise it in her opposition papers before the district court, in fact she did argue below that the VDOE's motion to dismiss was based only on her standing to request an IEE, and that "VDOE Defendants do not address the claims raised in Paragraph 38 of Plaintiff's Complaint," where she alleged the failure. Thus, Taylor has preserved this claim, even though the magistrate judge did not address it in rendering his judgment